UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DAVID D. TROTTER,

    Plaintiff,

v.                                          Case No. 05-C-1032

PHIL KINGSTON, et al.,

    Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR TIME EXTENSION AND
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff David D. Trotter, an inmate at Waupun Correctional Institute ("WCI"), lodged a civil rights complaint under 42 U.S.C. § 1983 against defendants, most of whom are WCI staff members. According to Trotter, defendants violated his rights when, with knowledge of his asthmatic condition, they used pepper spray on other inmates housed in the same section of the prison as he and then ignored his complaints that the spray was adversely affecting him. In an earlier screening order, the court dismissed the complaints against certain defendants, but allowed Trotter to proceed against the remaining defendants on an Eighth Amendment claim of deliberate indifference and on any related state law claims. (*See* Order of October 24, 2005, at 4.) The case is now before me on the defendants' motion for summary judgment. Also before me is plaintiff's motion for an extension of time for the filing of certain affidavits in response to defendants' motion. For the following reasons, both motions will be granted.

**BACKGROUND**

In his complaint, Trotter alleges that on several dates in 2005, certain WCI staff members, when utilizing chemical incapacitating agents on other inmates, exposed him to same, that these exposures caused him to suffer adverse reactions on account of his asthma, and that his requests for medical help were ignored. Trotter concedes in his response brief, however, that for all but one of those dates, his federal claims are barred by his failure to comply with the exhaustion requirement of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). (Resp. Br. at 3; *see also* discussion *infra*.) Therefore, the court will limit its recitation of the factual background to the relevant events that allegedly occurred at WCI on March 28, 2005.[1]

The WCI Health and Segregation Complex ("HSC") houses inmates who have exhibited behaviors that suggest a high risk of assault against staff or other inmates, or who may be at risk to harm themselves. ((DPFOF ¶ 47.) As of March 28, 2005, Trotter was assigned to cell #218 on the upper level of HSC. (*Id.* ¶ 51.) At approximately 1:15 p.m. on that date, Captain Steven L. Schueler was informed by HSC staff that an inmate in a lower-level shower area had broken his razor and cut himself. When Schueler reported to the shower area, he saw the inmate holding the razor firmly against his own neck, and saw blood trickling down his neck. (*Id.* ¶ 54.) The inmate ignored the unit sergeant's orders to put the razor down, and instead made slashing motions. (*Id.* ¶ 55.) Concerned for the inmate's safety, Captain Schueler instructed the sergeant to apply incapacitating agents into the shower cage, and the sergeant delivered an approximately one-second burst of pepper spray (aka "OC," which is an abbreviation of its technical name, oleoresin

---

[1] Trotter has not submitted his own proposed findings of fact, but instead has chosen to respond to defendants' version, as the local rules allow. *See* Civil L.R. 56(b). The factual background will be taken from defendants' version, with the court noting those factual assertions challenged by Trotter.

capsicum). (*Id.* ¶¶ 55, 56.) The inmate was then restrained, provided a shower, given medical attention, and placed in observation status. (*Id.* ¶ 56.) This incident took place on the lower level, some 300 feet from Trotter's cell on the upper level.[2] (*Id.* ¶ 57.) Trotter alleges that some of the pepper spray reached his cell and caused him to have an asthma attack. (Aff. of David Trotter at 1.) He claims he pressed the emergency call button and informed the WCI staff respondent (allegedly, defendant Todd Russell) of his asthma attack. (*Id.*) Trotter claims that some 30-45 minutes later he told Captain Schueler of his breathing difficulties and the lingering chemicals in the air, that Schueler said he would call a nurse, and that no nurse was sent. (*Id.* at 1-2.)

Around 2:30 p.m. that same day, an inmate housed in cell #126 on the lower level alerted staff that he was hearing voices and was going to kill himself. (DPFOF ¶¶ 58, 62.) After the inmate proved recalcitrant, Captain Schueler ordered defendant Todd Russell and other WCI staff to participate in a cell extraction of that inmate. (*Id.* ¶¶ 61, 64.) After the inmate refused to obey directions aimed at removing him from the cell, Captain Schueler delivered a one-second burst of pepper spray into the cell. (*Id.* ¶¶ 66, 67.) The inmate was then restrained, escorted away, provided a shower, and placed on observation status in a different cell. (*Id.* ¶¶ 67-70.) This inmate's lower-level cell was located about 210 feet away from Trotter's upper-level cell.[3] Trotter claims he again

---

[2] Trotter disputes that the lower-level shower area where this incident took place is approximately 300 feet from his assigned cell (Pl.'s Resp. to DPFOF ¶ 1), but he has neither submitted, nor pointed to, any evidence to the contrary. Defendants' proposed finding is therefore accepted as true. *See* Civil L.R. 56.2(b).

[3] As with the earlier incident, Trotter disputes the physical distance between his cell and the cell where WCI staff delivered a burst of pepper spray. (Pl.'s Resp. to DPFOF ¶ 3, Objection to No. 70.) To contest this distance, Trotter points to the affidavit of fellow asthmatic inmate Lonnie Jackson, who states that the inmate who threatened himself with a razor blade was housed in a cell within 50 feet of Trotter's cell and his own. (Aff. of Lonnie Jackson ¶ 4.) However, Jackson's statement, if it is not to contradict Trotter's own version of the events (Trotter Aff. ¶¶ 3, 4), must be taken as referencing the inmate involved in the 8:30 p.m. incident.

3

pushed the emergency call button and told the responding staff member that he was sick from the pepper spray and needed help. (Aff. of David Trotter ¶ 3.) Trotter was told a nurse would be summoned (*id.*), but apparently none appeared.

The third pepper spray incident that day in HSC was precipitated by an inmate in a cell immediately adjacent to Trotter's. Around 8:30 p.m., defendant Captain Debra Gempeler (formerly, and named in complaint as, Debra Tetzlaff) learned that this inmate had grabbed some medication from an officer and refused to return it. (DPFOF ¶ 72.) Concerned that the inmate would take the medication and thereby harm himself, Gempeler attempted to convince the inmate to return the medications, but he refused. (*Id.* ¶¶ 72, 73.) A cell extraction team was formed, which included defendant Todd Russell. (*Id.* ¶ 74.) Because the inmate refused to obey orders to come forward and turn over the medication, Gempeler dispensed a one-second burst of pepper spray into the inmate's cell. (*Id.* ¶ 76.) The inmate came forward, put his arms out, but then withdrew them before restraints could be applied to his wrists. (*Id.* ¶¶ 76, 77.) Gempeler then dispensed another one-second burst of pepper spray, after which the inmate was restrained, provided a shower, transported to a different cell (A-203), and placed on control status (*Id.* ¶¶ 77-81.)

As to the 8:30 p.m. incident, Trotter claims he alerted Gempeler, Russell, and the rest of the extraction team assembling in the area outside his cell that he was asthmatic and already suffering from the earlier pepper spray incidents that day, and that he begged them to take him to a strip cage or holding booth so that he could avoid further exposure. (Aff. of David Trotter ¶ 4.) Shortly after the pepper spray was delivered in the adjacent cell, Trotter vomited, experienced difficulty in breathing, and feared he would suffer a "fatal asthma attack." (*Id.*) He again pressed the emergency call button, informed the respondent of his asthma attack, and requested immediate medical

4

attention. (*Id.*)  At 9:30 p.m., a health services unit ("HSU") nurse visited Trotter's cell and asked him some questions.[4]  He responded that he was having an asthma attack, had vomited, and was very ill and scared.  (*Id.*)  According to the nurse, however, Trotter was not exhibiting shortness of breath or other respiratory problems, and in fact was "very forceful" with his demands.  (Aff. of Mary A. Gorske ¶ 6; *id.* Ex. 1000 at 1.)  Trotter asked for a shower (to wash off any residue) and a change of clothing, but the nurse told him to stay put until the air cleared.  (Aff. of David Trotter ¶ 4.)  A nurse checked the status of inmates on the range of the unit,[5] and advised Captain Gempeler that none of them was showing signs of distress due to the pepper spray.[6]  (DPFOF ¶ 82.)  On April 1, 2005, Trotter was seen by a nurse in the HSU, per his written request dated March 31, 2005, and the nurse found he had no breathing problems or wheezing and that his lungs were clear.  (Aff. of Mary A. Gorske ¶ 7.)  The progress notes documenting Trotter's later contacts with the HSU (on April 5, April 9, April 21, May 2, May 16, May 17, June 9, June 30, and July 18, 2005) do not indicate that Trotter expressed any concerns about his physical ailments or complaints related to exposure to any incapacitating agent.  (DPFOF ¶ 104.)

---

[4] Trotter identifies the nurse as defendant Mary A. Gorske, a nurse practitioner at WCI. However, Gorske's affidavit indicates that a registered nurse was sent to assess Trotter on that occasion, and HSU records indicate Trotter was seen at that time by Nurse Schaeffer.  (Aff. of Mary A. Gorske Ex. 1000 at 1.)

[5] It is not clear from the record when the nurse made this round.  Apparently, the round, like the nurse's visit to Trotter's cell, was made at 9:30 p.m, given that the round seems to have been made by the same nurse (Nurse Schaeffer) who attended to Trotter.  (*See* Aff. of Debra Gempeler Ex. 1001 at 2; Mary Gorske Aff. Ex. 1000 at 1.)

[6] Trotter states that he contests this proposed finding of fact.  However, his challenges are directed at the nurse's medical conclusion, *not* at the factual assertion that the nurse made the round and advised Captain Gempeler as set forth above.  (*See* Pl.'s Resp. to DPFOF at (contesting No. 82); Trotter Aff. ¶ 4; Jackson Aff. ¶ 2-4.)

Trotter filed a complaint within the prison grievance system regarding the March 28th incidents, and then appealed subsequent adverse decisions. On September 27, 2005, Trotter filed suit in this court, seeking compensatory and punitive damages as well as injunctive relief. The court's screening order dismissed several defendants, but allowed Trotter to proceed against the remaining defendants in their individual capacities with an Eighth Amendment claim of deliberate indifference and any related state-law claims. (*See* Order of October 24, 2005.)

## DISCUSSION

**I. Motions for Summary Judgment**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any

6

essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**II. Analysis**

The issues in this case have been narrowed by several concessions in plaintiff's response brief. First, plaintiff does not oppose entry of judgment in favor of defendants Mary Gorske, Belinda Schrubbe, Gail Waltz, Matthew Frank, and April Wheeler as to all claims.[7] (Resp. Br. at 1.) The court will therefore dismiss these defendants. Second, under the Prisoner Litigation Reform Act ("PLRA"), a prisoner may not file an action complaining of prison conditions under federal law until all available administrative remedies are exhausted. 42 U.S.C. § 1997e(a). Trotter concedes that, as to claimed Eighth Amendment violations occurring on dates other than March 28, 2005,[8] he has not complied with the PLRA's exhaustion requirements. (Resp. Br. at 3.) Those claims will therefore be dismissed. Third, under Wisconsin law, a claimant may not file a suit against a state

---

[7] Although plaintiff provides no explanation, the reason for his concession appears to be these defendants' lack of personal involvement in the events at issue. (*See* Resp. Br. at 1; Br. in Supp. of Mot. for Summ. J. at 18-19, 26-31.) April Wheeler's name is now April Reinke. (DPFOF ¶ 27.)

[8] In his complaint, Trotter alleges he was exposed to incapacitating agents on the following dates in 2005: March 28, April 1, April 2, May 22, May 27, and July 24. (Compl. ¶¶ 13-16.) At his deposition on July 20, 2006, Trotter added three more dates from 2005: March 29, March 30, and June 23. (DPFOF ¶ 52.)

7

Case 1:05-cv-01032-WCG    Filed 03/27/07    Page 7 of 18    Document 85

officer, employee or agent unless he serves written notice of his claim upon the attorney general within 120 days of the event(s) causing the injury. Wis. Stat. § 893.82(3). Strict compliance with the statute is required. *See* Wis. Stat. § 893.82(2m); *Riccitelli v. Broekhuizen*, 595 N.W.2d 392, 399 (Wis. 1999). A plaintiff must comply with the statute whether he files in state court or federal court. *Weinberger v. State of Wisconsin*, 105 F.3d 1182, 1187-88 (7th Cir. 1997); *West v. Macht*, 235 F. Supp. 2d 966, 971 (E.D. Wis. 2002). Trotter concedes that he has not strictly complied with the requirements of Wis. Stat. § 893.82 (Resp. Br. at 4), and so his state law claims will be dismissed as well.

The sole remaining issue, therefore, is whether the remaining defendants, through their acts or omissions related to the three spraying incidents on March 28, 2005, violated Trotter's Eighth Amendment rights through deliberate indifference to his medical condition. The remaining defendants as to this claim are Phil Kingston, WCI Warden; Steven Schueler and Captain and Debra Gempeler, Captains at WCI; and Todd Russell, Correctional Officer at WCI.

Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display "deliberate indifference to serious medical needs of prisoners." *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A deliberate indifference claim requires both an objectively serious risk of harm and a subjectively culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Greeno*, 414 F.3d at 653. To satisfy the objective component, plaintiff must demonstrate he suffered from a serious medical need, which is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno*, 414 F.3d at 653. The subjective component of a deliberate indifference claim requires that

8

the prison official knew of "an excessive risk to inmate health or safety" and disregarded the risk—that is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere medical malpractice or a disagreement with a health professional's medical judgment is not deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Greeno*, 414 F.3d at 653. Nevertheless, a plaintiff's receipt of some medical care does not automatically defeat a claim of deliberate indifference if a fact-finder could infer the treatment was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" a medical condition. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (quotation and citation omitted).

The Seventh Circuit has set forth several constitutional guideposts regarding the use of chemical incapacitating agents. The use of a chemical incapacitating agent such as tear gas or pepper spray is not a per se violation of the Eighth Amendment. *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984). Chemical incapacitating agents may be used in limited quantities when reasonably necessary to subdue, or maintain control over, an inmate, even where the inmate is locked in his cell or is in handcuffs. *Id.* (citation omitted). The use of chemical incapacitating agents violates the Eighth Amendment only if it is used "in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." *Id.* (citation omitted).

Trotter alleges that his Eighth Amendment rights were violated by defendants' deliberate indifference to his medical needs, more specifically, (1) by allowing pepper spray directed at other inmates to reach him on March 28, 2005, when they knew he was asthmatic; and (2) by ignoring his medical needs after he was exposed to the spray. I will analyze each category in turn.

### A. Deliberate indifference arising from exposure to pepper spray

Trotter does not dispute several important aspects of the prison staff's use of pepper spray. First, he does not dispute that the use of an incapacitating agent such as pepper spray is a form of non-deadly force that may be applied in circumstances set forth in Wisc. Admin. Code § DOC 306.09(3) and by staff who have been trained in its use. (DPFOF ¶ 32.) Second, Trotter does not dispute that there exist emergency situations for which WCI staff must use incapacitating agents immediately in order to prevent imminent escape or to subdue or deter an inmate who is unruly or who poses an immediate threat of bodily injury or death to himself or someone else. (DPFOF ¶¶ 31 (first sentence undisputed), 34.) Third, as to all three instances, Trotter does not dispute that WCI staff followed the DOC's policy regarding the use of incapacitating agents by first communicating with the inmate and attempting to gain control without use of the agent. (DPFOF ¶¶ 55, 60, 62, 73.)

Trotter disputes defendants' proposed finding that under WCI policy, incapacitating agents are used only to control an inmate, when necessary, but never to punish him. (Pl.'s Resp. to DPFOF at 2 (contesting No. 31).) However, Trotter has submitted no evidence to dispute this finding, and it is difficult to see how he could submit *any* evidence of punishment *arising from the sprayings themselves* (i.e., separate from his subsequent medical treatment), for in none of them did staff direct the pepper spray at him or intend that it reach him. Rather, he concedes that in each of the three relevant incidents on March 28, 2005, the pepper spray was used by trained staff in order to gain control of an inmate who posed an immediate threat of serious bodily injury or death to himself.

The parties also dispute whether defendants knew of Trotter's asthma on or before March 28, 2005. Trotter argues that defendants, allegedly aware of his asthmatic condition, should have removed him from his cell prior to their use of pepper spray on other inmates. But it is one thing

10

to say that the defendants knew Trotter was asthmatic; it is another thing altogether to assume they knew (without any concrete evidence) that using pepper spray in another inmate's cell would pose a serious risk to his health. Presumably 5% or more of the population has asthma and don't need their own separate wing at prisons, which is essentially what Trotter's argument assumes. Regardless of whether the defendants knew of Trotter's condition, there is no evidence that they had reason to believe that a one-second burst of pepper spray directed at another inmate in a different cell, and even on a different floor, would adversely affect him. Where prison officials believe, in good faith, that they are confronted with an emergency situation, they enjoy significant discretion in determining appropriate measures and in postponing procedural protection until after the event. *Hayes v. Walker*, 555 F.2d 625, 633 (7th Cir. 1977). "[A]bsent a claim of bad faith or mere pretext on the part of prison authorities in the imposition of emergency procedures, the underlying basis of decision must be deemed to lie fully within their expertise and discretion and, accordingly, is insulated from subsequent judicial review." *LaBatt v. Twomey*, 513 F.2d 641, 647 (7th Cir. 1975). Trotter has not alleged any bad faith or pretext on defendants' part; indeed, he concedes that they were responding to legitimate emergency situations. Therefore, defendants' decision to employ pepper spray in these emergency situations is beyond judicial review, and the question of defendants' knowledge of Trotter's asthma is immaterial to whether they were deliberately indifferent to his medical condition by directing pepper spray at other inmates on these three occasions.

### B. Deliberate indifference arising from subsequent medical care

From the evidence on the record, no genuine issue of material fact exists as to whether defendants were deliberately indifferent to Trotter's medical condition through acts or omissions

11

related to their dispensing of the pepper spray, but what about defendants' subsequent attention to Trotter's medical needs? In analyzing this question, I will group the first two spraying incidents together and then examine the third one by itself.

It strains credulity to believe that Trotter suffered a serious asthmatic attack in the wake of the first two spraying incidents, both of which occurred on the lower level and at considerable distance from Trotter's cell—some 300 feet in the first instance, and about 210 feet in the second. Furthermore, the floors, ceilings, and walls of the HSC are constructed of concrete. Trotter has introduced no evidence indicating that, prior to these releases of pepper spray, WCI failed to follow its standard procedures to minimize distribution of incapacitating agents. These procedures include (1) turning on exhaust fans and turning off the air circulation system on the affected wing until the incapacitating agent clears (DPFOF ¶ 38); (2) closing the cell door immediately after delivering the incapacitating agent therein, closing the door after the targeted inmate is extracted, and keeping the door closed until the cell is cleaned (DPFOF ¶¶ 38, 39); (3) escorting the targeted inmate away and affording him a shower and a change of clothes (DPFOF ¶ 36; WCI Procedure 814.03 ¶ 12 (sealed exhibits, Dkt. # 66)); and (4) cleaning the targeted cell and replacing the mattress and bedding (DPFOF ¶ 40.).[9] In addition to the above precautionary measures, the medical staff at HSC, having concluded Trotter suffered from mild asthma, had provided him with an inhaler and with two asthma medications. (DPFOF ¶¶ 106, 107; Aff. of Mary A. Gorske ¶¶ 12, 13.)[10]

---

[9] Trotter does dispute whether all of these procedures were followed for the third incident.

[10] Trotter disputes these proposed findings, arguing they are medical opinions and so must be offered by a qualified medical expert. (Resp. Br. at 2.) Defendants base these proposed findings on the affidavit of Mary Gorske, a nurse practitioner at WCI who is not listed as a medical expert for defendants. However, these factual assertions are based on Gorske's personal knowledge of Trotter's medical records (*see* Aff. of Mary A. Gorske ¶¶ 1, 5), and personal knowledge is an adequate basis for an affidavit. *See* Fed. R. Civ. P. 56(e).

12

Assuming, however, that Trotter's version of the events is true, as I must do here on defendants' motion for summary judgment, I conclude that any asthmatic attack he suffered after the first two spraying incidents was not of the severity contemplated by *Estelle* and its progeny. Asthma, depending upon the degree of severity, can constitute a serious medical condition. *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001). However, the injuries of which Trotter complains in the wake of the first two incidents—shortness of breath, difficulty in breathing, nausea, and tightness in the chest—are, objectively speaking, relatively minor. *See, e.g., Oliver v. Deen*, 77 F.3d 156, 160-61 (7th Cir. 1996) (finding that plaintiff inmate could not show a sufficiently serious medical condition to implicate the Eighth Amendment where he suffered only mild asthma and alleged it was aggravated by cell mate's cigarette smoke). No doubt such injuries would be distressing and discomforting, but they are not sufficiently serious to be constitutionally actionable.

I turn then to the third incident at issue, and first examine the objective component, that is, whether Trotter suffered from a serious medical injury as a result of his exposure to the pepper spray. The record is rather inconsistent here. In his affidavit, Trotter claims he became "violently ill," vomited, could not breathe, and feared he was going to suffer "a fatal asthma attack." (Aff. of David Trotter ¶ 4.) However, his deposition testimony paints a much different picture.

> Q: [C]an you tell me how you think being exposed to these chemical agents aggravates your asthma? Like what happens to you? If you can describe it for me.
> A: My chest tightens and I'm struggling for air.
> Q: Anything else?
> A: More like a gag, trying to, you know, get wind to my lungs.
> Q: Anything else?
> A: Not that—that's pretty much it.
> Q: So when you—when these chemical agents are sprayed, what you just described to me is what you suffer?
> A: Yes.
> Q: And other than what you just described to me, there isn't anything else that you can think of?
> A: Not that I can think of right at this moment.

13

(Dep. of David Trotter, Ex. b pt. 3 to Aff. of Ma Manee Moua.) In his complaint, Trotter alleges other physical reactions subsequent to the third incident, namely, blurred vision, burning eyes, spitting up mucus and blood, vomiting blood, difficulty keeping down food, rectal bleeding, skin irritation, and dizziness. (Compl. at 3.) However, Trotter's medical records for this period indicate that a fair number of these maladies were ongoing or had other causes.[11] Furthermore, Trotter's complaint is unclear as to when all of these injuries arose. Nevertheless, the court will construe the evidence in a light most favorable to Trotter as the non-moving party. Even in that light, however, there is no genuine issue of material fact as to whether Trotter's injuries after the third spraying incident were objectively serious.

I first note that Trotter has introduced no evidence to contest defendants' assertion that standard procedures, described above, were followed to minimize the effects of the pepper spray on both the targeted inmate and on other inmates. Trotter points to the affidavit of an inmate housed near the targeted cell to dispute that the air circulation and exhaust systems were utilized according to the standard procedure during the third incident, (Aff. of Lonnie Jackson ¶ 5), but the inmate's statement is internally inconsistent and will be disregarded.[12]

---

[11] For example, Trotter's reported complaints related to his eyes seem traceable to his own error in placing ear drops into his eyes. (DPFOF ¶ 110.) Defendants also contend that inhalation of pepper spray does not cause rectal bleeding, and can cause skin irritation only where there is direct contact with large doses. (DPFOF ¶¶ 108, 109.) Plaintiff disputes these proposed findings on the ground that they are offered by a non-medical expert. (Pl.'s Resp. to DPFOF at 2; *see also* note 10 *supra*.)

[12] Trotter points to the following paragraph as creating the dispute:

> When OC [i.e., pepper spray] is used on a range of the segregation unit it spreads to the other cells of that range rapidly. The OC enters a cell under the door, through a gap on the hinge side of the door and through the ventilation system. The exhaust

According to the HSU records, Trotter was seen at by a nurse at 9:30 p.m.,[13] and the nurse noted he was speaking without any distress and exhibited no respiratory problems.[14] (DPFOF ¶ 82; Aff. of Mary A. Gorske Ex. 1000 at 1.) Indeed, the nurse's written report states that Trotter was "very forceful" in his demands, which, according to Trotter, were to be taken to the showers and given a change of clothes. (Aff. of Mary A. Gorske Ex. 1000 at 1; Aff. of David Trotter ¶ 4.) Trotter's ability to shout his demands further indicates that his asthmatic condition was not objectively serious. Similarly, the fact that the nurse found *no* indications of distress one hour after the incident, at a time when Trotter claims he was still experiencing a serious medical condition, indicates that his claim is without merit. The record strongly suggests Trotter was rather "trigger happy" with the emergency call button as well. For example, he hit the emergency call button after the first two spraying incidents, which, occurred in areas over 200 feet away from Trotter's cell and

---

> system remains off for about twenty minutes after the OC is used and when it is turned back on the OC is then pulled out of the cell where it was sprayed and is spread through the hallway and again enters other cells.

(Aff. of Lonnie Jackson ¶ 5.) First, this statement describes the ventilation policy generally, but gives no indication that it is describing what transpired during the third incident. Second, the exhaust system is used to pull air directly from the affected wing to the outside. (DPFOF ¶ 49.) It makes no sense to claim that the standard procedure is to turn the exhaust system off for 20 minutes or that once turned back on, the *exhaust system* circulates the contaminated air. To the extent that any such circulation takes place, it would be effected by the air circulation system, not the exhaust system. Trotter disputes DPFOF paragraph 49, but his challenges do not speak to the substance of that paragraph. (*See* Pl.'s Resp. to DPFOF at 2 (disputing No. 49).)

[13] Trotter's version of the facts here is arguably even more favorable to defendants, for he states that "at least 30 minutes" elapsed, rather than one hour, before the nurse arrived. (Aff. of David Trotter ¶ 4.)

[14] Trotter has submitted evidence that "about 20 minutes" after the third spraying, security guards took him and another inmate to the strip cage. (Aff. of Lonnie Jackson ¶ 4.) The record is silent as to what treatment, if any, either inmate was given at that time.

15

on a different level. His deposition testimony reveals that he also hit the emergency call button on April 1 and 2, 2005, again to complain of asthmatic attacks that allegedly required emergency medical attention. (Dep. of David Trotter at 22-23, 35.) While it may be discomforting and even unnerving to suffer exposure to pepper spray, the test for objective seriousness of a medical condition or need is not determined by the inmate's subjective fears. And it is important to note that in this third spraying incident, which seems to have precipitated more severe reactions than the first two, Trotter *himself* was not sprayed.

Furthermore, even if Trotter's condition had been objectively serious, there is insufficient evidence for a reasonable juror to conclude that defendants' acts or omissions satisfy the subjective component of a deliberate indifference claim. Quite to the contrary, the record shows that the standard prophylactic measures were implemented, both before and after the pepper spray was dispensed, and that Trotter's medical needs, even though not serious, were attended to. After the emergency occasioned by the inmate adjacent to Trotter had been resolved, a nurse made a round of the range and reported to Captain Gempeler that none of the inmates was showing any signs of distress due to the pepper spray.[15] Trotter was seen by a nurse one hour after his exposure. To prevail on his claim of deliberate indifference, Trotter must show that the defendants intentionally disregarded a known medical condition. His evidence suggests, however, that, at worst, they underappreciated his condition (acted negligently), which is not enough to show deliberate indifference. *Cf. Jones v. Shields*, 207 F.3d 491, 493, 496 (8th Cir. 2000) (finding no Eighth Amendment violation where inmate did not receive medical attention until 20 minutes after direct

---

[15] As mentioned above, it is not clear from the record when the nurse made this round, but apparently it was made at 9:30 p.m. by the same nurse who attended to Trotter. (*See* n.5 *supra*.)

16

facial exposure to chemical incapacitating agent). Furthermore, Trotter was seen in HSU several days later, per his request, and the nurse found he had no respiratory problems or other lingering effects. HSU saw Trotter on nine other occasions over the following few months, and in none of them did Trotter express concerns about his physical ailments or complaints related to exposure to any incapacitating agent. Finally, according to defendants' expert witness, whose testimony is unchallenged, the non-medical staff acted appropriately in the wake of Trotter's exposure to pepper spray, and the care given by the medical personnel was excellent. (DPFOF ¶¶ 154-55.)

**III. Motion for extension of time**

Plaintiff filed a motion to enlarge the time within which to file the affidavits of Trotter and a fellow inmate. Plaintiff timely submitted affidavits that were signed before plaintiff's counsel rather than a notary, as no notary was then available at WCI. Subsequently, plaintiff did submit properly notarized affidavits. Defendants have not responded to the motion. In light of the circumstances and the lack of any perceived prejudice to defendants, the court will grant plaintiff's motion.

**CONCLUSION**

This case has been narrowed to the question of whether the remaining defendants violated Trotter's Eighth Amendment rights through their acts or omissions relative to the use of pepper spray on other inmates during three separate incidents at WCI on March 28, 2005. From the evidence on the record, no reasonable juror could conclude that plaintiff faced an objectively serious medical need on any of the three occasions.

17

**IT IS THEREFORE ORDERED** that defendants Mary Gorske, Belinda Schrubbe, Gail Waltz, Matthew Frank and April Wheeler (now April Reinke) are **DISMISSED**, and all claims against those defendants are dismissed with prejudice. Plaintiff's claims arising from alleged exposure to incapacitating agents on dates other than March 28, 2005, as well as plaintiff's state law claims, are **DISMISSED**, without prejudice. Defendants' motion for summary judgment is **GRANTED**, and plaintiff's claims arising from alleged exposure to incapacitating agents on March 28, 2005, are dismissed, with prejudice. Plaintiff's motion for an extension of time is **GRANTED**.

Dated this   27th   day of March, 2007.

      s/ William C. Griesbach
William C. Griesbach
United States District Judge